UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FREDERICK ALAN VOIGHT and DAYSTAR FUNDING, LP,<br><br>Defendants,<br><br>and<br><br>F.A. VOIGHT & ASSOCIATES, LP, RHINE PARTNERS, LP, TOPSIDE PARTNERS, LP, INTERCORE, INC., and INTERCORE RESEARCH CANADA, INC. a/k/a INTERCORE CANADA RESEARCH, INC.,<br><br>Relief Defendants. | Civil Action No. |

# COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Frederick Alan Voight ("Voight") and DayStar Funding, LP ("DayStar") (collectively, "Defendants"), and F.A. Voight & Associates, LP ("FAVA"), Rhine Partners, LP ("Rhine"), Topside Partners, LP ("Topside"), InterCore, Inc. ("InterCore"), and InterCore Research Canada, Inc. ("IRC") (collectively, "Relief Defendants"), respectfully alleging the following:

## I.
## SUMMARY

1. Since 2004, Frederick Alan Voight has raised at least $114.1 million from approximately 300 investors nationwide in a series of fraudulent promissory note offerings

conducted through entities he formed and controlled, including FAVA and DayStar. Throughout his scheme, Voight offered and sold one-year notes on the promise that investor monies would fund research and development activities of various public companies, including InterCore, for which Voight served as an officer and director. But in truth, the purported interest and principal FAVA and DayStar paid investors were Ponzi payments derived entirely from the funds of new investors.

2. Beginning on October 8, 2014, Voight carried out a series of related note offerings through DayStar, raising $13.8 million (of the total $35.9 million raised through DayStar) from 260 investors nationwide by promising investors that their money would be used to fund InterCore's acquisition of a "lucrative business opportunity" involving its Driver Alertness Detection System ("DADS") technology ("DADS Offering"), which it claims can alert drivers of microsleep in advance of dangerous fatigue levels or driving accidents. Voight promised annual interest payments to investors of as much as 42%. But as a member of InterCore's Board of Directors and its Vice President of Business Development and Investments, Voight knew the touted InterCore opportunity did not exist and that InterCore had no means of paying investors the promised returns.

3. All $13.8 million of investor proceeds from the DADS Offering is gone. Voight spent $8.6 million in Ponzi interest payments to prior investors (approximately $7.2 million to FAVA investors, and approximately $1.4 million to DayStar investors), and secretly funneled $4.7 million to InterCore and its subsidiary, IRC – through his alter ego entities Rhine and Topside in exchange for cash, stock, and other compensation that primarily inured to Voight's personal benefit.

4. Voight raised approximately $78.1 million through FAVA and approximately $36 million through DayStar ($13.8 million of which was the DADS Offering). All purported interest and principal payments to investors were, in fact, Ponzi payments and were not the result of return on their investment.

5. The SEC brings this civil enforcement action seeking against Defendants permanent injunctions, disgorgement plus pre-judgment interest, and civil penalties for violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)] and Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]. Additionally, the Commission seeks disgorgement from the Relief Defendants—persons or entities to which Defendants diverted investor funds—regarding all funds derived, directly or indirectly, from the Defendants' fraudulent conduct.

## II.
## JURISDICTION AND VENUE

6. Defendants offered and purported to sell one-year promissory notes, which investments constitute securities, and/or did offer and sell investment contracts, under Section 2(1) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Securities and Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78c(a)(10)].

7. The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. The Commission seeks the imposition of civil penalties pursuant to Section 20(d)(2)(C) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3)(B)(iii) of the Exchange Act [15 U.S.C. §§ 78u(d)].

8. This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21 and 27 of the Exchange Act [15

U.S.C. §§ 78u and 78aa] because Defendants directly or indirectly made use of the means or instrumentalities of commerce and/or the mails in connection with the transactions described herein. Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of Defendants' acts, practices, transactions, and courses of business alleged herein occurred within this judicial district.

### III.
### DEFENDANTS

9. Voight, age 58, resides in Richmond, Texas. He is the owner and control person of DayStar, FAVA, Rhine, and Topside and owns at least 45% of InterCore's common stock.

10. DayStar is a Texas limited partnership headquartered at Voight's residence in Richmond, Texas. Voight formed DayStar in April 2013 and at all times has served as its Managing Director with control over the entity's operations and bank accounts.

### IV.
### RELIEF DEFENDANTS

11. FAVA is a Texas limited partnership headquartered at Voight's residence in Richmond, Texas. Voight formed FAVA in 2004 and at all times has served as President of FAVA's general partner, with control over FAVA's operations and bank accounts. FAVA owns at least 6.5 million shares of InterCore common stock.

12. Rhine is a Texas limited partnership headquartered in Rosenberg, Texas. Voight formed Rhine in October 2013 and at all times has served as control person and a member of Rhine's general partner, with control over Rhine's operations and bank accounts. Rhine owns at least 1.7 million shares of InterCore common stock.

13.     Topside is a Texas limited partnership headquartered in Rosenberg, Texas. Voight formed Topside in October 2013 and at all times has served as control person and a member of Topside's general partner, with control over Topside's operations and bank accounts. Topside owns at least 2.5 million shares of InterCore common stock.

14.     InterCore is a Delaware corporation doing business in Delray Beach, Florida. It is a reporting company under Section 12(g) of the Exchange Act (ticker: ICOR) and is quoted on OTC Link ATS. InterCore is delinquent in its required Commission filings, having failed to file its year-end 2014 Form 10-K, and its first quarter 2015 Form 10-Q. Since January 2014, InterCore has conducted operations through its wholly owned subsidiary IRC, from IRC's offices in Montreal, Quebec.

15.     IRC, a/k/a InterCore Canada Research Inc., f/k/a SRG International, Inc. is a Canadian company headquartered in Montreal, Canada but which has minimum contacts within the United States. It is a wholly owned subsidiary of InterCore and filed for bankruptcy in the District of Montreal, Province of Quebec in April 2015 in Case No. 500-11-048541-151.

## V.
## STATEMENT OF FACTS

**A.   Voight has carried on a multi-million dollar Ponzi scheme since 2004.**

16.     Although he has never been registered with the Commission in any capacity, Voight has long participated in the investment industry. Since 1992, he has served as an officer or director of numerous public companies. Between June 2013 and April 2015, Voight served as a member of InterCore's Board of Directors and as its Vice President of Business Development and Investments. Voight currently owns at least 45% of the common stock of InterCore, a publicly traded research and design company primarily focused on its DADS technology, which

it claims can alert drivers of microsleep in advance of dangerous fatigue levels or driving accidents.

17. Since forming FAVA in 2004, Voight has raised approximately $114.1 million from at least 300 United States investors in a series of fraudulent promissory note offerings conducted through entities he formed and controlled, including FAVA and DayStar. Throughout his scheme, Voight offered and sold one-year notes on the promise that investor monies would fund research and development activities of various public companies for which Voight served as an officer and director, including InterCore. In reality, Voight misappropriated investor funds and all sums paid to investors as supposed interest and principal were merely Ponzi payments derived entirely from the funds of new investors. None of Voight's promissory note offerings were registered with the Commission or any state regulator.

18. Since October 2014, Voight has carried out a series of related note offerings, through DayStar, which he claimed were intended to fund InterCore's acquisition of a lucrative business opportunity involving its DADS technology (collectively, "DADS Offering"). Through the DADS Offering, Voight and DayStar raised at least $13.8 million – of the total $114.1 million raised since 2004 – from at least 260 United States investors.

19. In reality, the DADS Offering was simply the latest phase in Voight's longstanding Ponzi scheme and, today, all $13.8 million is gone.

20. Of the $114.1 million raised, approximately $22 million is missing, lost or otherwise unaccounted for.

**B.    Defendants have raised $13.8 million since launching the DADS Offering on October 8, 2014.**

21. On or about October 8, 2014, Voight wrote and distributed a letter, on DayStar letterhead, describing a "tremendous" but time-sensitive investment opportunity to fund start-up

technology company InterCore ("Offer Letter"). Defendants sent the Offer Letter to every InterCore shareholder of record, some of whom had already invested in Voight's prior FAVA or DayStar notes, or both, as well as other clients and prospective investors.

22.  In their October 8, 2014 Offer Letter, Defendants solicited investments in one-year DayStar promissory notes guaranteeing 30-42% annual returns, depending on how quickly an investment was made. Defendants claimed that DayStar intended to raise $4.3 million, which it would loan to InterCore to "take over the book of business of another company" and install its DADS technology in "several million trucks and buses." Defendants promised that the transaction would generate millions of dollars in monitoring fees for InterCore, from which note investors' returns would be paid. The Offer Letter assured investors that "[t]he return on this investment is so tremendous, it is worth that amount many, many times over . . . and it is certainly worth paying a very generous interest rate in order to secure the funds!" The Offer Letter pressured investors to act quickly, falsely claiming that "[InterCore] need[s] to commit to this transaction this week."

23.  In February 2015, Defendants disseminated a second offer letter soliciting clients to invest their "Lazy Money" in additional DADS Offering notes scheduled to mature January 31, 2016 and promising a 24% annual return (collectively with the Offer Letter, "Offer Letters").

24.  Defendants raised $13.8 million from 260 nationwide investors in connection with the Offer Letters, including issuing new notes as recently as May 31, 2015.

25.  When Voight wrote and distributed the Offer Letters, he knew that there was no potential InterCore transaction – and thus no urgency to invest immediately.

26.  Furthermore, Voight knew when he launched and carried out the DADS Offering that InterCore had no prospect of generating revenues sufficient to pay the promised high

returns. Indeed, since its inception InterCore had incurred significant losses and negative cash flows. It had an accumulated deficit of $24.5 million by September 30, 2014, one week before Defendants launched their DADS Offering. Given InterCore's poor financial condition, the company concluded there was "substantial doubt about [its] ability to continue as a going concern." As an InterCore director, Voight was well-aware of the company's financial straits and knew the only way to pay the high returns he promised DADS Offering investors was through Ponzi payments.

**C.   Voight spent $8.6 million of DADS Offering proceeds on Ponzi payments to DADS and non-DADS investors as purported interest and principal.**

27.   In fact, Voight used the majority of the DADS Offering proceeds to make undisclosed Ponzi payments to prior investors.

28.   Defendants spent approximately $7.2 million of DADS Offering investment proceeds on supposed interest and principal payments – including as recently as June 1, 2015 – to earlier investors in prior, non-DADS promissory note offerings Voight carried out through FAVA and DayStar.

29.   Defendants also spent approximately $1.4 million raised from later DADS Offering investors on supposed interest payments to earlier DADS Offering investors.

**D.   Voight funneled $4.7 million of DADS Offering proceeds through Rhine and Topside to secure valuable, undisclosed benefits for himself, to the further detriment of DADS Offering investors.**

30.   Contrary to the myriad promises contained in Defendants' Offer Letters, DayStar did not loan any DADS Offering proceeds to InterCore.

31.   As alleged, and unbeknownst to investors, Defendants misappropriated $8.6 million of DADS Offering proceeds to make Ponzi payments to earlier investors. After spending $500,000 to cover administrative costs of DayStar and other Voight-affiliates, Voight funneled

the remaining $4.7 million to alter egos Rhine and Topside who, in turn, loaned the funds to InterCore at favorable interest rates. InterCore's public filings with the Commission failed to disclose that Rhine and Topside were related parties owned and controlled by Voight, InterCore's 45% stockholder and, at the time, a vice president and director.

32. Rhine and Topside received funds in connection with Defendants' unlawful activities to which they had, and have, no legitimate claim.

33. By routing funds through Rhine and Topside, Voight deprived DADS Offering investors of any interest in, or rights flowing from, the InterCore loans. Under the terms of the DADS Offering promissory notes, only DayStar pledged its assets as security – not Voight, Rhine, or Topside.

34. In addition, Voight's undisclosed involvement of Rhine and Topside allowed him to secure clandestine benefits including:

- Unvalued, cashless InterCore Series D preferred stock conversion features on the Rhine and Topside loans;

- At least $188,000 in facility fees;

- $792,000 paid to Rhine in partial satisfaction of a $4 million May 2014 credit facility;

- 2,415,000 InterCore common stock warrants, all exercisable without cash, issued to Topside, 1,290,491 of which Topside exercised between October 15 and November 17, 2014 *for no consideration*; and

- 13,450,000 InterCore common stock warrants, exercisable without cash, issued to Rhine.

35. None of these benefits inure to DADS Offering investors, who were never told about them, much less about Rhine and Topside's involvement.

### E.     InterCore and IRC are defunct and lost the DADS Offering funds.

36.     InterCore transferred the $4.7 million obtained from DADS Offering investors to IRC, its wholly owned Canadian subsidiary, supposedly to fund further research and design activities in connection with the DADS technology.

37.     InterCore and IRC received, directly or indirectly, funds or benefits in connection with the unlawful activities alleged herein and have no legitimate claim thereto.

38.     On April 13, 2015, InterCore publicly claimed that unauthorized individuals posing as IRC employees stole a substantial sum from IRC, which sum InterCore and IRC have conceded includes the $4.7 million obtained from DADS Offering investors.

## VI.
## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violations of Section 17(a) of the Securities Act
### [Against Voight and DayStar]

39.     The Commission repeats and re-alleges Paragraphs 1 through 38 of the Complaint as if fully set forth herein.

40.     By engaging in the conduct described herein, Defendants directly or indirectly, in the offer or sale of securities and by use of the means and instrumentalities of interstate commerce or of the mails, or any facility of a national securities exchange, have:

(a)     employed devices, schemes or artifices to defraud; or

(b)     obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

41.     With regard to their violations of Section 17(a)(1) of the Securities Act, Defendants acted intentionally, knowingly or with severe recklessness with respect to the truth.

With regard to their violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, Defendants acted at least negligently.

42. By engaging in this conduct, Defendants violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

## SECOND CLAIM
### Violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder
### [Against Voight and DayStar]

43. The Commission repeats and re-alleges Paragraphs 1 through 38 of the Complaint as if fully set forth herein.

44. By engaging in the conduct described herein, Defendants directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, with *scienter*:

    (a)    employed devices, schemes, and artifices to defraud; or

    (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

45. Defendants engaged in this conduct intentionally, knowingly or with severe recklessness with respect to the truth.

46. By engaging in this conduct, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM
### Violations of Sections 5(a) and 5(c) of the Securities Act
### [Against Voight and DayStar]

47.     The Commission repeats and re-alleges Paragraphs 1 through 38 of the Complaint as if fully set forth herein.

48.     Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the SEC as to such securities, and have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no registration statement had been filed with the SEC as to such securities.

49.     During all relevant periods, there were no applicable exemptions from registration.

50.     By engaging in this conduct, Defendants violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and §77e(c)].

## FOURTH CLAIM
### Control person liability under
### Section 20(a) of the Exchange Act
### [Against Voight]

51.     The Commission repeats and re-alleges Paragraphs 1 through 38 of the Complaint as if fully set forth herein.

52.     At all relevant times, Defendant Voight possessed, directly or indirectly, the power to direct and control, and in fact directed and controlled the management, general operations, and policies of DayStar, and was a control person of DayStar pursuant to Section

20(a) of the Exchange Act [15 U.S.C. § 78t(a)]. Voight induced or was a culpable participant in DayStar's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

53. By reason of his actions alleged herein, Defendant Voight is jointly and severally liable with DayStar as a control person, pursuant to Section 20(a) of the Exchange Act, for DayStar's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and, unless enjoined and restrained, will continue to violate this provision and rule.

## FIFTH CLAIM
### Claim Against Relief Defendants FAVA, Rhine, Topside, Intercore, and IRC As Custodians of the Proceeds of Fraud

54. Plaintiff Commission repeats and re-alleges paragraphs 1 through 38 of this Complaint as if fully set forth herein.

55. Relief Defendants received, directly or indirectly, funds and/or benefits from the Defendants, which are the proceeds of, or are traceable to the proceeds of, the unlawful activities alleged herein. Relief Defendants have no legitimate claim to these funds.

56. Relief Defendants have been unjustly enriched in that they each obtained the funds as part of and in furtherance of the securities violations alleged herein, and under circumstances in which it is not just, equitable or conscionable for them to retain the funds.

57. The Commission is entitled to an order requiring that Relief Defendants disgorge these funds plus prejudgment interest thereon. In addition, the Commission is entitled to an order requiring Relief Defendants to provide an accounting of the receipt, use, and disposition of all investor proceeds.

## VII.
## **RELIEF REQUESTED**

For these reasons, the Commission respectfully requests that the Court enter a judgment:

(a) Finding that Defendants committed, and unless restrained will continue to commit, the violations alleged in the First through Fourth Claims for Relief in this Complaint;

(b) Permanently enjoining Voight and DayStar from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

(c) Permanently enjoining Voight from directly or indirectly, including, but not limited to, through any entity owned or controlled by Voight, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Voight from purchasing or selling securities for his own personal account;

(d) Permanently barring Voight, under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any public company;

(e) Ordering Voight and DayStar to pay, jointly and severally, disgorgement plus prejudgment interest in an amount to be determined by the Court;

(f) Ordering Voight and DayStar to pay civil penalties in amounts to be determined by the Court;

(g) Ordering Relief Defendants Rhine, Topside, InterCore and IRC to disgorge an amount equal to the funds and benefits they obtained directly or indirectly from Defendants which either are the proceeds of, or are traceable to the proceeds of, the unlawful activities alleged herein; and

(h) Granting such further relief as this Court may deem just and proper.

July 31, 2015

Respectfully submitted,

*/s/ Jennifer D. Brandt*

Jennifer D. Brandt
Attorney-in-Charge
S.D. Tex. Bar No. 37943
Texas Bar No. 00796242
United States Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry Street, 18th Floor
Fort Worth, TX 76102-6882
Phone: (817) 978-6442
Fax: (817) 978-4927
*brandtj@sec.gov*
ATTORNEYS FOR PLAINTIFF